## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Misty Evans, Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), being duly sworn, do hereby depose and state as follows:

## AFFIANT'S BACKGROUND AND QUALIFICATIONS

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since January of 2018. I am a graduate of the ATF National Academy Special Agent Basic Training Program, and the Federal Law Enforcement Training Center's Criminal Investigator Training Program. Prior to holding the Special Agent position, I was employed by the Kansas City, Missouri Police Department. I worked as a Patrol Officer from November 2008 until February 2013. The remainder of my employment, from February 2013 until January 2018 was spent as a Detective in the Narcotics and Vice Division. I also hold a bachelor's degree in criminal justice. I have participated in specialized training relating to firearms, firearms trafficking investigations, and drug investigations. As a Special Agent with ATF, I have conducted and/or participated in investigations involving firearms, arson, explosives, controlled substances, fraud, and money laundering. I have written and executed federal search warrants and arrest warrants. I have participated in the execution of numerous search warrants including search warrants relating to the illegal use, possession, and trafficking of firearms, the illegal use and possession of explosives, and the illegal use, possession, and distribution of controlled substances. I have conducted and/or participated in investigations resulting in the seizure of contraband, including firearms, narcotics, explosives, currency, vehicles, real estate, and bank accounts.

2. I have personally participated in this investigation and the facts contained in this affidavit come from my personal observations; my training and experience; the review of records,

documents, and physical evidence; and information obtained from other law enforcement officers and witnesses.   This Affidavit is intended to show merely that there is sufficient probable cause to establish that violations of the specified statutes have occurred, and it does not set forth all of my knowledge about this matter.

3. Based on my training and experience, as well as the facts set forth in this Affidavit, I believe there is probable cause to find violations of 18 U.S.C. §§ 371 and 922(a)(6), that is, conspiracy to make material false statements in the acquisition of firearms; violations of 18 U.S.C. §§ 922(a)(6) and 2, that is, aiding and abetting the making of materially false statements in the acquisition of firearms; and violations of 18 U.S.C. § 1001, that is, making materially false statements to federal agents, have been committed by **Ronnel Dewayne WILLIAMS, JR.,** and **Chaelyn Hendrick GROVES.**

## LEGAL BACKGROUND AND EXPLANATION OF KEY TERMINOLOGY

4. As used in the federal firearm laws, 18 U.S.C. § 921(3), defines the term "firearm" as, "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."

5. Title 18 United States Code, Section 922(a)(6) makes it unlawful -

> for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter.

2

6. When an individual, a non-licensee, wants to purchase a firearm from a Federal Firearms Licensee ("FFL") or licensed dealer, they are required to complete an ATF Form 4473 before the transfer of a firearm. This form requires basic identifying information such as the individuals name, date of birth, current address and other identifiable information. The individual then answers a series of disqualifying questions that would prohibit them from obtaining or possessing a firearm. One of these questions asks if the individual who is acquiring the firearm is the actual buyer and transferee of the firearm. After answering theses questions, the individual signs and dates the ATF Form 4473, and certifies that the information is true, correct, and complete, and further acknowledges that providing false information would subject the individual to federal prosecution for a felony crime. The FFL then relies upon the information provided by the buyer/transferee in the ATF Form 4473 to decide whether to go forward with the sale. If there are no disqualifying answers the FFL checks the identification (Drivers License, Passport) of an individual against the information on the ATF Form 4473. If the information matches, the FFL is then required to contact the *National Instant Criminal Background Check System (NICS).* NICS then provides one of three answers to the background check inquiry, Proceed, Delayed or Denied. This process can range from five minutes up to hours depending on how many background checks are being called in or submitted electronically. If the individual obtains a "proceed" the FFL can transfer the firearm to the buyer or transferee at that moment.

7. A NICS check must be completed on every sale unless an individual provides a concealed weapons permit from their state of residence. The NICS check must be completed on the FFL premises and further must be completed before the transfer of firearms from the FFL to the purchaser.

3

Case 4:24-mj-00021-JAM   Document 1-1   Filed 03/11/24   Page 3 of 14

8. Title 18 United States Code, Section 922(b)(1) makes it unlawful for an FFL to sell or transfer any firearm other than a ~~rife~~ rifle or a shotgun to a person the FFL knows or has reason to believe is less than twenty-one years of age.

**PROBABLE CAUSE**

9. On February 14, 2024, at approximately 1:49 p.m., multiple law enforcement agencies were working in uniform and plain clothes capacities in the area of 30 West Pershing Road, Kansas City, Missouri (Union Station), during the Super Bowl parade/rally when multiple sounds of shots were heard just to the west of the main stage, towards Pershing and Kessler Road. It was determined that a verbal altercation led to several people shooting firearms into the crowd. More than twenty people were injured, and one person was killed from a bullet that was fired. The Kansas City, Missouri Police Department recovered several firearms, spent shell casings, and other items of evidentiary value from the scene. One of the firearms recovered was described as a Stag Arms, Model Stag-15, 300 caliber pistol bearing Serial Number W-0061093.

10. On February 15, 2024, an analyst associated to the Kansas City ATF Intel group conducted traces of the firearms that were recovered in the area of Union Station on February 14, 2024. A trace of the Stag Arms, Model Stag-15, 300 caliber pistol, bearing Serial Number W-0061093 (Trace # T20240087719), determined it was purchased from The Ammo Box LLC. located at 8600 North Route E., Columbia, Missouri 65202, by **Ronnel Dewayne WILLIAMS, JR. (BM, DOB: 06/16/2002)** on November 25, 2023. The firearm was purchased 81 days prior to the date it was recovered at the parade. Based on my training and experience, I know this is a very short period of time from the purchase of the firearm from an FFL to the time the firearm is recovered by law enforcement which is indicative of straw purchasing of firearms and unlawful firearms trafficking activity.

11. Investigators contacted the FFL and owner of The Ammo Box LLC, and he provided the ATF Form 4473 for the purchase of the Stag Arms, Model Stag-15, lower receiver, bearing Serial Number W-0061093. The FFL stated the firearm was sold at the RK Gun Show at the KCI Expo Center in Kansas City, Missouri, on November 25, ~~2024~~ 2023.

12. The ATF Form 4473 provided by the FFL stated **WILLIAMS** purchased the Stag Arms, Model Stag-15, lower receiver, bearing Serial Number W-0061093 on November 25, 2023, from The Ammo Box LLC at the RK Gun Show located at 11730 North Ambassador Drive, Kansas City, Missouri 64153. The ATF Form 4473 revealed **WILLIAMS** used his Missouri Driver's License (DL #203A290016) in the transaction, and a NICS check was conducted. The NICS check generated a transaction number 10342CF47, resulting in a response of "Proceed." I also observed the answer to Question 21a. on the ATF Form 4473, was marked "Yes," in response to the question "Are you the actual transferee/buyer of the firearm(s) listed in this form and any continuation sheet(s)." **WILLIAMS** also signed the 4473 as the buyer/transferee certifying his answers as true, correct, and complete, and further acknowledging that if he provided false information that he would be subject to federal criminal prosecution for a felony.

13. On February 16, 2024, at approximately 3:53 p.m., Kansas Citym Missouri Police Department (KCMOPD) Task Force Officer (TFO) E. Joy and I conducted a recorded interview of **WILLIAMS** at his residence, 5427 East 28th Street, Kansas City, Missouri. **WILLIAMS** advised that he purchased the Stag Arms, Model Stag-15, lower receiver, bearing Serial Number W-0061093

5

from the gun show for approximately $250. Based on my training and experience, I know a lower receiver is the only controlled component of a firearm and all the other parts necessary can be purchased in a store or online without any other ~~NICS~~ NCIS checks. A lower receiver can be easily converted into a rifle or a pistol, as such an FFL cannot lawfully sell or transfer the lower receiver to an individual under twenty-one years of age.

      14.      **WILLIAMS** stated approximately one month after he purchased the firearm, it was stolen from a friend's residence, but he could not report it stolen because he didn't have the serial number. **WILLIAMS** stated approximately one month after he had purchased the firearm he had accidentally left it at his friend, "Ant's" residence on "Grove Street" in Kansas City, Missouri, near "Grove pool." He stated the firearm was stolen from the residence by an unknown party. I asked **WILLIAMS** to describe the events leading up to the theft and asked for, "Ant's" phone number. I advised him I would like to talk to "Ant" about the theft. **WILLIAMS** then made a Facetime call on his cell phone. **WILLIAMS** asked the person if he recalled the firearm getting stolen, to which he stated he did. The person on the phone, who identified himself as John Price, DOB: 06/05/2001, stated the firearm was stolen from his previous residence of 2913 Benton Plaza, Kansas City, Missouri. "Price" stated, "He did not know the name of the person who stole the firearm, but he was a light skinned male, approximately 17 or 18 years of age." When I asked "Price" how he knew it was that male who stole the firearm, **WILLIAMS** interrupted him and stated, "Cause he's got sticky fingers." **WILLIAMS** stated he did not know the male's name either but he was, "A friend of a friend." "Price" advised he no longer lives at the Benton Plaza address and has recently moved to an address near 38th and Benton. "Price" stated he did not know the exact address. "Price" provided his phone number as (816) 312-7849. "Price" stated he didn't have long to talk because he was at work and had nothing more to add to the investigation.

6

15. I asked **WILLIAMS** again to describe his knowledge of how the theft of his firearm occurred. **WILLIAMS** stated he accidentally left the firearm at "Price's" house shortly after purchasing it. He stated he contacted "Price" who stated he would bring the firearm to his house the following day. **WILLIAMS** stated the following day, "Price" called him and advised someone had stolen the firearm.

16. A computer check of the phone number provided by "Price" responded to **Chaelyn Groves**. A computer check of the address 2913 Benton Plaza revealed an individual by the name of **Chaelyn Hendrick GROVES (BM, DOB: 06/05/2004),** to be associated to the address. A computer check of the Kansas City, Missouri Police Department reporting system for **Chaelyn Hendrick GROVES (BM, DOB: 06/05/2004),** revealed a shooting where **GROVES** was shot by his six year old brother at his residence 2913 Benton Plaza in March 2023. There was no record of a "John Price" with the birth date he provided in the Kansas City, Missouri Police Department report writing system or through the Missouri Department of Revenue. However, the person registered to the phone number "Price" provided was of the approximate age as **WILLIAMS,** and the birth month and day that "Price" provided was the same as **GROVES.** For these reasons, I suspected that the individual who identified himself as "Price" on the phone call was lying, and his true identity was **Chaelyn Hendrick GROVES (BM, DOB: 06/05/2004)**. Based on statements made by **WILLIAMS** and "Price," I believe they lied to me to obscure their connection between the purchaser of the firearm and the shooter at Union Station.

17. Based upon the false statements **WILLIAMS** made to me, I recontacted **WILLIAMS** on February 17, 2024, at approximately 1:50 p.m. TFO C. Smith and I recontacted **WILLIAMS** at his residence 5427 East 28th Street, Kansas City, Missouri, to confront him about the false statements he made to me regarding the firearm during the interview the previous day.

During the interview I advised **WILLIAMS** that I knew he was being deceitful during his interview the day prior. **WILLIAMS** admitted that he had lied to me about the firearm in question, his knowledge of the firearm's transfers, and the identity of the related parties. I showed **WILLIAMS** a photo of **Chaelyn Hendrick GROVES** and asked who the photo was of. **WILLIAMS** hesitated and ultimately stated, "That's Chaelyn." **WILLIAMS** admitted **Chaelyn** was the person he talked to on the phone the previous day in the phone conversation that **WILLIAMS** coordinated. **WILLIAMS** confirmed "John Price's" true identity was **Chaelyn Hendrick GROVES (BM, DOB: 06/05/2004).**

18. **WILLIAMS** stated, "I did give the lower away, which is my fault. We did put a blackout barrel on it. I actually did get the lower 81 days ago, that's when the lower was given away." I asked **WILLIAMS** why didn't **Chaelyn**, go to the gun show and buy the firearm himself to which **WILLIAMS** responded, "Because he's 19." **WILLIAMS** stated he and **Chaelyn** went to the gun show together and were looking for lower receivers to buy. **WILLIAMS** stated **Chaelyn** found a receiver he wanted to buy and **GROVES** gave him (**WILLIAMS**) the money to purchase it for him. **WILLIAMS** stated, "We just all be buying lowers and we just put them together however we want to." **WILLIAMS** stated **GROVES** told him he was going to put a 300-blackout barrel on the receiver, but **WILLIAMS** said he had not seen the firearm since the purchase at the gun show. Based on my training and experience, I know FFLs may not sell, deliver, or otherwise transfer any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is under the age of 21. Based on **WILLIAMS** statements about purchasing the firearm for **GROVES**, I believe **WILLIAMS** provided a false written statement when he purchased the firearm and completed the ATF Form 4473 representing and certifying to the FFL that **WILLIAMS** was the actual buyer/transferee of the firearm.

8

19. **WILLIAMS** advised **GROVES** is a friend and stated, "I know I did lie but we didn't neither one of us had nothing to do with that, we were both at work, if you want to check my schedule you can see we were both at work so we couldn't possibly be able to pull the trigger." I advised **WILLIAMS** that at no time did I ever tell him, nor anyone inside his residence during the previous interview, that the firearm was used in or recovered at the Union Station/Super Bowl Parade shooting, and I asked **WILLIAMS** how he knew that information.

20. **WILLIAMS** stated the day prior, at approximately 12:00-1:00 p.m., when he was playing PlayStation live video game with his friend, "Ant," he learned that the firearm in question was used in the incident. "Ant" asked **WILLIAMS** if he knew the firearm was, "Traded" to which **WILLIAMS** stated he did not know that. "Ant" told **WILLIAMS** Chaelyn (**GROVES**) don't have that gun anymore. You know something bad had happened and you know that gun was traded and they used it for something." "Them lil n***s he traded it to, they were shooting at that parade." **WILLIAMS** stated he didn't know that, and stated **GROVES** didn't have anything to do with the shooting. **WILLIAMS** stated he heard about the shooting and that the firearm he purchased for **GROVES** was used in it. Based on my training and experience, I know while playing a live video game, individuals can freely have conversations much like a phone call. I know when a firearm is used in a crime individuals will sometimes trade the firearm for a new one.

21. On February 21, 2024, at approximately 3:03 p.m., TFO C. Smith and I contacted **GROVES** at the Park Highland Apartments, 6421 Manchester Avenue, Kansas City, Missouri (**GROVES'** employer) regarding his involvement in this investigation.

22. Upon arrival, TFO Smith and I contacted **GROVES** inside the office of the apartment complex. **GROVES** stated he was willing to speak with me.

9

23. I asked **GROVES** if he knew why investigators were wanting to speak with him. **GROVES** replied that Ronnel (Meaning **Ronnel WILLIAMS, JR. (BM, DOB: 6/16/2002)**) was talking about the "feds" coming to his house and he was scared. **GROVES** admitted that he had spoken with me on the phone on February 16, 2024, when **WILLIAMS** Facetime video called him. **GROVES** admitted that he lied to me about his identity and his residence at that time.

24. **GROVES** admitted he gave **WILLIAMS** money to purchase the firearm for him at the gun show. **GROVES** stated he believed the price for the firearm was approximately $500. The ATF form 4473 shows the purchase date to be November 25, 2023. **GROVES** stated at the following gun show, he purchased a 300-blackout upper to complete the firearm (the following KCI Expo Center gun show was December 17-18, 2023). **GROVES** stated shortly after he purchased the 300-blackout upper to complete the firearm **WILLIAMS** purchased for him. **GROVES** claimed the firearm was stolen during a "shootout" near his old residence 2913 Benton Plaza, Kansas City, Missouri. **GROVES** stated he did not call the police, but shortly after the shooting he observed police presence in the area. **GROVES** stated he did not report the firearm stolen; he just went to the gun show with a different friend who bought him another one. Based on my training and experience, I believe **GROVES** is withholding details about what happened to the firearm to distance himself from the shooters at Union Station. Based on **GROVES'** statement about getting a new firearm with a different friend, and my training and experience, I believe **GROVES** is looking for someone else to provide false statements while purchasing a firearm, which is indicative of unlawful firearms trafficking.

25. **GROVES** claimed as he was watching videos of the parade shooting on social media outlets, and he recognized two of the individuals involved. **GROVES** stated he recognized, "KP" and showed me a photo that was released of one of the shooters.



26. **GROVES** stated he also recognized, "Marquis" as "The one that was shot in his face." I had previous knowledge of Marques Harris (B/M, DOB: 06/06/2004) who was shot in the face during the shooting and showed **GROVES** a photo of him. **GROVES** affirmed that he believed it was the "Marquis" who used to reside in the same complex as **GROVES**. Based on **GROVES** stating he lived near Harris and recognized "KP," two of the alleged Union Station shooters, and my training and experience, I believe **GROVES** knows the Union Station shooters, and he is again attempting to distance himself from the firearm and the shooters, which is also indicative of unlawful firearms trafficking.

27. **GROVES** stated on February 16, 2024, **WILLIAMS** called and stated he was "in some serious trouble because someone got caught with my lower that I bought for you." **GROVES** stated afterwards he began watching videos of the incident and observed what he believed to be the firearm **WILLIAMS** purchased for him leaning against a wall at the Union Station shooting scene. **GROVES** stated that the upper portion of the firearm had been switched out from the original one he had purchased. **GROVES** stated his upper was all black and he had a "4 inch" on it. **GROVES** then pulled up a video on his cell phone to show me the condition it was in when it was stolen. I observed an AR pistol lying on a flat surface. The video panned out to show five other

11

handguns and an AR pistol with appeared to have a metallic pink buffer tube and foregrip. The photo below is a screengrab from the video.



28. **GROVES** said that he was not old enough to legally possess the firearms, which was the reason **WILLIAMS** purchased the firearm for him at the gun show on November 25, 2023, by lying on the ATF Form 4473 when **WILLIAMS** signed and certified that he was the actual buyer/transferee of the firearm. Based on my training and experience, I know individuals between 18 and 21 may lawfully possess firearms with some exceptions; however, a person under the age of twenty-one is not allowed to purchase a firearm that is not a shotgun or a rifle from an FFL. 18 U.S.C. § 922(b)(1). Therefore, **GROVES**, was unable to purchase the lower receiver because it was not a shotgun or rifle, and he may have believed he was also not allowed to possess the firearm.

12

Case 4:24-mj-00021-JAM   Document 1-1   Filed 03/11/24   Page 12 of 14

## **CONCLUSION**

29.     Based on the foregoing, I believe there is probable cause to believe that between on or about November 25, 2023, and February 21, 2024, **WILLIAMS** and **GROVES** conspired to make false statements in the acquisition of a Stag Arms, Model Stag-15, lower receiver, bearing Serial Number: W-0061093, at the RK Gun Show, 11730 North Ambassador Drive, Kansas City, Missouri, located in the Western District of Missouri in violation of 18 U.S.C. §§ 371, and 922(a)(6).

30.     There is probable cause to believe that on or about November 25, 2023, **WILLIAMS** and **GROVES** aiding and abetting each other, did knowing make materially false statements to an FFL in connection with the acquisition of a firearm in violation of 18 U.S.C. §§ 922(a)(6) and 2.

31.     There is also probable cause to believe that on or about February 16, 2024, **WILLIAMS** and **GROVES** knowingly and willfully made materially false statements to federal agents in violation of 18 U.S.C. § 1001.

32. Based on the foregoing, I submit there is probable cause to issue the requested criminal complaint and arrest warrants against **Ronnel Dewayne WILLIAMS, JR.,** and **Chaelyn Hendrick GROVES.**

_____
Misty Evans
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

*Digitally signed by MISTY EVANS*
*Date: 2024.03.11 13:14:07 -05'*

Subscribed to and sworn to before me on this

__11th__ day of March 2024, by reliable electronic means.

Sworn to by telephone
2:02 PM, Mar 11, 2024

_____
HONORABLE LAJUANA M. COUNTS
United States Magistrate Judge
Western District of Missouri

